## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RYAN CURTIS,** | : | **Civil No. 3:23-CV-2092** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **LACKAWANNA COUNTY,** | : | |
| *et al.,* | : | |
| | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM OPINION</u>

On August 16, 2024, the instant case was reassigned to the undersigned, the parties having consented to magistrate judge jurisdiction. (Doc. 61). This prisoner civil rights case was initiated in December 2023 by Ryan Curtis, whose claims relate to his brief period of pretrial incarceration at Lackawanna County Prison from his arrest on February 11, 2022, to February 24, 2022, when he was released on bail. Curtis claims that prison medical officials and corrections officers denied him medical care for a serious infection he developed on his left second toe which resulted in its complete surgical amputation. Specifically, although he acknowledges that the medical defendants provided him the antibiotics he was prescribed, he claims he was never provided prescribed wound care supplies nor was his wound ever cleaned or re-dressed as instructed, despite his multiple requests.

Our review of the complaint reveals that Curtis has adequately stated a claim of deliberate indifferent with regard to the medical and institutional defendants but has not adequately alleged wrongdoing of a constitutional dimension on the part of the corrections officer defendants. Accordingly, for the reasons set forth below, we will grant the motions to dismiss with regard to the corrections officer defendants and deny the motions with regard to the Lackawanna County, Wellpath, and the medical defendants.

## I.    **Factual Background**

The factual background of this case can be simply stated. The plaintiff, Ryan Curtis, was arrested on February 11, 2022, on drug-related charges. (Doc. 1, ⁋ 49). At the time of his arrest, Curtis complained to the arresting officers about a painful blister on his toe and was taken to Geisinger Community Medical Center (GCMC). (Id., ⁋⁋ 50-51). Curtis was experiencing pain, swelling, and redness in the second toe of his left foot with a rash and purulent drainage. (Id., ⁋⁋ 52-53). His toe was cleaned, and the blister was lanced and a wound culture was sent to the lab for analysis. (Id., ⁋⁋ 53-56). His toe was then packed with quarter-inch packing and his foot was wrapped with gauze and an Ace bandage. (Id., ⁋ 57). Curtis was diagnosed with a left second toe abscess/cellulitis and prescribed the oral antibiotic, clindamycin. (Id., ⁋ 59). His discharge instructions, which were provided to the arresting officers, stated:

> [C]over the wound with a clean/dry dressing; change the dressing if it is soaked with blood or puss; take medication as prescribed; follow up with your healthcare provider as advised; gauze packing should be removed in 1-2 days; after packing is removed, continue to clean the area until the skin opening closes; and, check the wound daily for signs of worsening infection.

(Id., ⁋ 62). He was also instructed to follow up at Geisinger Wound Care Center, to call GCMC Podiatry by February 14, 2022, and to contact a healthcare provider if he experienced increased redness or swelling, red streaks in the skin leading away from the wound, increasing local pain or swelling, continued pus draining from the wound two days after treatment, a fever of 100.4 or higher, and/or boil returns. (Id., ⁋ 60, 63).

After his release from GCMC, Curtis was transferred to Lackawanna County Prison (LCP) as a pretrial detainee and was committed to the special needs unit (SNU) for a mandatory COVID quarantine period. (Id., ⁋ 64, 66). Curtis alleges that, although Nurse Iannuzzi ordered a prescription for clindamycin, he did not examine or speak to Curtis, gave no orders regarding wound care, and established no follow-up care plan. (Id., ⁋⁋ 67-68). He also alleges that he was given no wound care supplies for the duration of his incarceration, from February 12, 2022, through the date of his amputation, February 19, 2022. (Id., ⁋ 69). Curtis alleges that he complained to prison nurses Defendants Mahoney, Smith Oleavia, Peterson, Geisler, Furman, and/or Wayman of increasing pain and redness in his left foot and that the

blister on his toe was not improving with the antibiotic when he was given his antibiotic treatment three times daily. (Id., ¶¶ 70-72). He states that he showed the nurses his infected toe and they "displayed disgusted looks and, at times, instructed that they did not want to see it again," but that they merely instructed him to wash the wound in the sink in his cell and did not provide any wound care supplies or schedule an examination. (Id., ¶¶ 72-75). He also alleges that he repeatedly asked the defendant corrections officers for wound care and cleaning supplies and to send him to medical for treatment but that his requests were denied. (Id., ¶¶ 86-89). Moreover, according to Curtis, he submitted a Health Services Request "during the first few days of his incarceration" requesting that his infection be re-dressed and cleaned. (Id., ¶ 78). Despite his complaints, he alleges his wound was never properly cleaned, nor the bandages re-dressed during his incarceration at LCP. (Id., ¶ 79). As a result, Curtis alleges he was forced to drain his infected wound himself in his cell and wrap it with a sock since he had only the original, soiled bandage from GCMC. (Id., ¶¶ 76-77).

Curtis was seen by Dr. Ahmed on February 17, 2022, who examined his toe and "told Mr. Curtis he was fine, handing back the saturated bandage," and returned him to his cell without cleaning, draining, or otherwise treating his infected wound. (Id., ¶¶ 80-82). Curtis submitted another Health Services Request that same day stating that antibiotics did not seem to be helping, that his toe was still very inflamed

and painful and that he had been draining it himself. (Id., ℙ 83). He received a response from Nurse Wayman two days later, on February 19, 2022, telling him to continue with his prescribed meds without examining or speaking to him. (Id., ℙ 84). He was then seen by Nurse Iannuzzi on February 19, 2022, who examined his left second toe and noted moderate to severe swelling and edema, rash, a foul odor, purulent discharge, decreased sensation, and pain while ambulating, and ordered his immediate transfer to GCMC for evaluation and treatment of cellulitis with a concern for osteomyelitis. (Id., ℙℙ 90-92).

According to Curtis's complaint, the wound culture taken at GCMC revealed that the bacteria infecting his toe was resistant to the prescribed antibiotic, but no medical staff followed up for the results or adjusted his medication. (Id., ℙℙ 82, 85). At the GCMC emergency department, imaging showed osteolytic changes in the left second toe that were concerning for osteomyelitis, and visual examination showed a purulent and actively draining wound. (Id., ℙℙ 95-96). The wound was drained, and a surgery plan was made to partially or completely amputate Curtis's left second toe. (Id., ℙℙ 100-101). On February 21, 2022, he underwent a complete surgical amputation of his toe. (Id., ℙ 101). Surgical pathology later confirmed acute osteomyelitis. (Id., ℙ 103). Curtis returned to LCP on February 22, 2022, and was released on bail two days later. (Id., ℙℙ 104-05).

Curtis filed this complaint on December 18, 2023, naming nearly thirty defendants, including individual medical defendants,[1] corrections officer defendants,[2] as well as the contractor providing medical services at LCP, Wellpath, and Lackawanna County. (Doc. 1). He alleges violations under 42 U.S.C. § 1983 of his Fourteenth Amendment rights, as well as State law tort claims sounding in negligence, stating that the defendants were deliberately indifferent to his serious medical needs and denied him medical care, and attempting to impute institutional liability upon the County and Wellpath. (Id.) His complaint alleges that, as a result of the deliberate indifference and negligence of the defendants, he suffered extreme pain, emotional distress, worsening, infection, the complete amputation of his left second toe, and an increased risk of worsening infection and amputation. (Id., at ¶ 110). He claims that he has incurred medical bills and was rendered sick, sore, and disabled and sustained mental and physical pain and discomfort and loss of earning

---

[1] The individual medical defendants are Nurses Iannuzzi, Oleavia, Mahoney, Wayman, Smith, Peterson, Geisler, and Furman, and Dr. Ahmed. The nurse defendants have collectively filed a motion to dismiss with Wellpath. (Doc. 10). Dr. Ahmed has filed a separate motion to dismiss. (Doc. 47).

[2] The corrections officer defendants are C.O.s Bloom, Burda, Burrier, Dixon, Houman, Jackson, Kelly, Kopa, Loven, Mills, Moskwa, Posluszny, Tavares, Wesley, Wharton, Jones, Sgt. Dranchak, and Sgt. Trichilo. The corrections officer defendants have collectively filed a motion to dismiss with Lackawanna County. (Doc. 58).

capacity, and loss of everyday pleasures and enjoyment of life for which he requests compensatory and punitive damages. (Id., ¶¶ 112-114).

The individual medical defendants and officer defendants have filed two separate partial motions to dismiss Curtis's complaint.[3] (Docs. 10, 58). Dr. Ahmed has also filed a separate motion to dismiss the claims against him. (Doc. 47). The motions are fully briefed and ripe for disposition. (Docs. 11, 15, 16, 48, 49, 50, 64, 69). For the reasons set forth below, we recommended that the medical defendants' motion to dismiss be denied and the corrections officer defendants' motion to dismiss be granted.

## II.    Discussion

### A.  Motion to Dismiss—Standard of Review

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

---

[3] The defendants move only to dismiss the constitutional claims against them and have not addressed the negligence claims in the complaint at this juncture.

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), continuing with our opinion in <u>Phillips</u> [<u>v. County of Allegheny</u>, 515 F.3d 224, 230 (3d Cir. 2008)], and culminating recently with the Supreme Court's decision in <u>Ashcroft v. Iqbal</u>, –U.S.–, 129 S. Ct. 1937 (2009), pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. <u>Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc.</u>, 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." <u>Associated Gen. Contractors of Cal. v. California State Council of Carpenters</u>, 459 U.S. 519, 526 (1983). As the Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), in order to state a valid cause of action, a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

actions will not do." Id. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Rather, in conducting a review of the adequacy of a complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

Thus, following Twombly and Iqbal, a well-pleaded complaint must contain more than mere legal labels and conclusions; it must recite factual allegations

sufficient to raise the plaintiff's claimed right to relief beyond the level of mere

speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to
> state a claim, district courts should conduct a two-part analysis. First,
> the factual and legal elements of a claim should be separated. The
> District Court must accept all of the complaint's well-pleaded facts as
> true, but may disregard any legal conclusions. Second, a District Court
> must then determine whether the facts alleged in the complaint are
> sufficient to show that the plaintiff has a "plausible claim for relief." In
> other words, a complaint must do more than allege the plaintiff's
> entitlement to relief. A complaint has to "show" such an entitlement
> with its facts.

Fowler, 578 F.3d at 210-11.

> As the Court of Appeals has observed:

> The Supreme Court in Twombly set forth the "plausibility" standard for
> overcoming a motion to dismiss and refined this approach in Iqbal. The
> plausibility standard requires the complaint to allege "enough facts to
> state a claim to relief that is plausible on its face." Twombly, 550 U.S.
> at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard
> when the factual pleadings "allow[ ] the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged." Iqbal,
> 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955).
> This standard requires showing "more than a sheer possibility that a
> defendant has acted unlawfully." Id. A complaint which pleads facts
> "merely consistent with" a defendant's liability, [ ] "stops short of the
> line between possibility and plausibility of 'entitlement of relief.' "

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011), cert. denied,

132 S. Ct. 1861, 182 L.Ed.2d 644 (2012).

In practice, consideration of the legal sufficiency of a complaint entails a

three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must

plead to state a claim.' <u>Iqbal</u>, 129 S. Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' <u>Id.</u> at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' <u>Id.</u>" <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130 (3d Cir. 2010).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. <u>Sands v. McCormick</u>, 502 F.3d 263, 268 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." <u>Pension Benefit Guar. Corp. v. White Consol. Indus.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." <u>Pryor v. Nat'l Collegiate Athletic Ass'n</u>, 288 F.3d 548, 560 (3d Cir. 2002); <u>see also</u> <u>U.S. Express Lines, Ltd. v. Higgins</u>, 281 F.3d 382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment"). However, the court may not rely on other parts of the record in

determining a motion to dismiss, or when determining whether a proposed amended complaint is futile because it fails to state a claim upon which relief may be granted. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

It is against these legal guideposts that we assess the sufficiency of Curtis's constitutional claims against the defendants.

## B. **The Motion to Dismiss the Plaintiff's Monell Claims Against Lackawanna County and Wellpath Will Be Denied.**

At the outset, we address the plaintiff's claims against the two institutional defendants, Lackawanna County and the corporate entity Wellpath. Curtis faces an exacting burden in pleading a municipal or corporate liability civil rights claims. It is well settled that municipalities and other local governmental entities or officials may not be held liable under federal civil rights laws for the acts of their employees under a theory of *respondeat superior* or vicarious liability. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868; see also Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991). However, they may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To sustain a Monell municipal liability claim, a plaintiff must "identify a municipal 'policy' or 'custom'

that caused the plaintiff's injury" to prevail. Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). This custom must be "so widespread as to have the force of law." Id. at 404, 117 S.Ct. 1382; see also Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (a policy is an official proclamation or edict of a municipality, while a custom is a practice that is "so permanent and well settled as to virtually constitute law") (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted)).

The plaintiff must further "allege that a 'policy or custom' of [the defendants] was the 'moving force' behind the [constitutional] violation." Grayson v. Mayview State Hosp., 293 F.3d 103, 107 (3d Cir. 2002) (citing Brown, 520 U.S. at 404, 117 S.Ct. 1382). A municipality can be held liable on the basis of failure to train when "that failure amounts to 'deliberate indifference ... [of the constitutional] rights of persons. . . .'" Woloszyn v. County of Lawrence, 396 F.3d 314, 324 (3d Cir. 2005) (citations omitted). There must also be a causal nexus, in that the "'identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury.'" Id. at 325 (citations omitted). Moreover, in the context of liability for failure to train or supervise, courts have recognized a three-part test to determine whether such a failure amounts to the necessary showing of deliberate indifference to constitutional rights:

> in order for a municipality's failure to train or supervise to amount to deliberate indifference, it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.

Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999).

Thus, any analysis of a claim under Monell requires separate consideration of two distinct issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so whether the [municipality] is responsible for that violation." Collins v. City of Harker Heights, Texas, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Therefore, a municipality or other local government may be liable under this section only if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. Connick v. Thompson, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011); Monell, 436 U.S. at 692, 98 S.Ct. 2018. However, under § 1983, local governments are responsible only for "their own illegal acts," and "are not vicariously liable under § 1983 for their employees' actions." Connick, 563 U.S. at 60, 131 S.Ct. 1350. Accordingly, plaintiffs who seek to impose liability on local governments for federal civil rights violations must prove that "action pursuant to official municipal policy" caused the injury complained of. Id. (citing Monell, 436 U.S. at 691, 98 S.Ct. 2018).

Guided by these threshold principles, the Third Circuit has further explained

that there are:

> [T]hree situations where acts of a government employee may be
> deemed to be the result of a policy or custom of the governmental entity
> for whom the employee works, thereby rendering the entity liable under
> § 1983. The first is where the appropriate officer or entity promulgates
> a generally applicable statement of policy and the subsequent act
> complained of is simply an implementation of that policy. The second
> occurs where no rule has been announced as policy but federal law has
> been violated by an act of the policymaker itself. Finally, a policy or
> custom may also exist where the policymaker has failed to act
> affirmatively at all, [though] the need to take some action to control the
> agents of the government is so obvious, and the inadequacy of existing
> practice so likely to result in the violation of constitutional rights, that
> the policymaker can reasonably be said to have been deliberately
> indifferent to the need.

Natale, 318 F.3d at 584 (internal quotation marks and citations omitted).

Similar legal standards apply to corporate civil rights culpability claims. On

this score, it is clearly established that:

> [P]rivate corporations that contract with the state to provide services
> also cannot be subjected to liability under § 1983 on the basis of
> *respondeat superior*. See Natale v. Camden County Corr. Facility, 318
> F.3d 575, 583-84 (3d Cir. 2003); see also Monell v. Dep't of Soc. Servs.,
> 436 U.S. 658, 691-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding
> that a municipality cannot be liable under § 1983 on a theory of
> *respondeat superior*). Instead, in order to hold a private corporation
> liable under § 1983, a plaintiff must prove that he suffered a
> constitutional deprivation as a result of an official corporate policy or
> custom. Natale, 318 F.3d at 583-84; see also Bd. of the County
> Comm'rs v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d
> 626 (1997); Griggs v. Dauphin County Prison, No. 1:06-0823; 2008
> WL 2518090, at *4 (M.D. Pa. June 19, 2008); Miller v. City of Phila.,
> No. 96-3578, 1996 U.S. Dist. LEXIS 17514, 1996 WL 683827, at *4

(E.D. Pa. Nov. 26, 1996) (in order to establish liability for a private corporation, a plaintiff must show that the corporation, "with 'deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [plaintiff's] constitutional harm.' ") (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)).

As the Third Circuit has explained, a

> policy or custom can be established in two ways. Policy is made when a "decisionmaker possessing final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). Custom may also be established by evidence that demonstrates knowledge or acquiescence. Beck, 89 F.3d at 971 (citing Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989)).

Mason v. PrimeCare Med., Inc., No. 1:14-CV-1680, 2017 WL 1386198, at *8

(M.D. Pa. Apr. 18, 2017).

In this case, the plaintiff alleges his claims against the County and Wellpath

jointly, stating that both entities had policies, customs, and/or practices related to

insufficient staffing, failing to provide adequate medical attention to inmates, failing

to provide necessary wound care to inmates, and had a policy, custom and/or practice

of keeping inmates in need of emergency medical attention at LCP without

transferring those inmates to the hospital because of cost and/or staffing. He also

alleges that both entities failed to train, supervise, and control their employees on diagnosing and/or treating inmates in the need of emergent medical care and transfer to a hospital and in recognizing when emergency medical care is required for inmates. He has alleged both the County and Wellpath had these joint policies and avers that these deficient policies ultimately caused his constitutional injuries.

As discussed below, Curtis's complaint does allege a constitutional injury with regard to the denial of medical care for his infected toe. And, while both institutional defendants argue that the complaint has failed to identify, with the requisite degree of specificity, the precise policies and customs which led to the constitutional injury, we recognize the difficulty in doing so at this stage of the litigation, without the benefit of discovery. Through discovery, the plaintiff will need to demonstrate which entity held the responsibility for the training and supervision of the medical staff in recognizing when emergency care is needed, but there could be a basis for liability should discovery reveal that, for example, there is a history of mismanagement of emergency situations or the treatment of infections at LCP based upon a deficient policy or failure in training. Moreover, policies relating to staffing or cost which could result in the constitutional injury identified, for example, the failure to provide wound care supplies or change and clean dressings, could support institutional liability in this case. Thus, while the plaintiff ultimately will be required to prove that such policies exist with regard to either the County, Wellpath, or both,

given the allegations in the complaint we will allow discovery to proceed on the

<u>Monell</u> claims against the County and Wellpath, with the understanding that much

more will be needed to impute liability upon these defendants at the summary

judgment stage. Accordingly, the motions to dismiss will be denied with regard to

Lackawanna County and Wellpath.

C. **<u>The Medical Defendants' Partial Motion to Dismiss Will Be Denied.</u>**

Curtis alleges that each of the medical defendants denied him medical care for

his serious toe infection by failing to provide the prescribed follow-up care

recommended by the emergency department. Specifically, he alleges that, although

medical staff provided him with the prescribed antibiotics, they never cleaned or re-

dressed his wound nor provided him any wound dressings despite him informing

them multiple times of his worsening infection. The medical defendants argue that

his constitutional claims cannot proceed where the plaintiff was provided some form

of medical care, but just disagrees with the treatment he was provided. They also

argue they did not meet the subjective requirement for deliberate indifference

because they did not have the requisite state of mind for an Eighth Amendment

violation.

As the plaintiff was a pretrial detainee during the relevant times, the Due

Process Clause rather than the Eighth Amendment is applicable in this case. The

Third Circuit has held that pretrial detainees like Curtis "are not within the ambit of

18

the Eighth Amendment['s], prohibition against cruel and unusual punishment.*"* Hubbard v. Taylor, 399 F.3d 150, 166 (3d Cir. 2005) (quoting Boring v. Kozakiewicz, 833 F.2d 468, 471 (3d Cir.1987)) (internal quotations omitted). The court of appeals has distinguished "between pretrial detainees' protection from 'punishment' under the Fourteenth Amendment, and convicted inmates' protection from punishment that is 'cruel and unusual' under the Eighth Amendment," noting that pretrial detainees "are not yet at a stage of the criminal process where they can be punished because they have not as yet been convicted of anything. As the Supreme Court explained in Bell, pre-trial detainees cannot be punished at all under the Due Process Clause." Id. (citing Bell v. Wolfish, 441 U.S. 520 (1979)). As this Court has noted, "the Eighth Amendment establishes a floor. But, in the context of the provision of medical care, there is an open question of how much more protection unconvicted prisoners should receive under the Fourteenth Amendment than convicted prisoners receive under the Eighth Amendment." Evans v. Columbia Cnty., 711 F. Supp. 3d 256, 274 (M.D. Pa. 2024), dismissed, No. 24-1227, 2024 WL 3676934 (3d Cir. Apr. 16, 2024) (citing Hubbard at 165-66; Mattern v. City of Sea Isle, 657 F. App'x 134, 138 n.5 (3d Cir. 2016)) (internal quotations omitted). Thus, the due process rights of a pretrial detainee are "at least as great" as the Eighth Amendment protections to which a convicted prisoner is entitled. City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983).

While recognizing that some amount of greater protection is afforded to pretrial detainees above the protections provided to a convicted prisoner, this Court and the United States Court of Appeals for the Third Circuit have continued to apply the standards enunciated in Eighth Amendment cases in assessing medical claims by pretrial detainees. See Evans, 711 F. Supp. 3d at 275 (collecting cases).

Assessing Curtis's claims under the Eighth Amendment standard, his claims arise from the alleged deliberate indifference of the medical defendants to his serious medical needs. Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice standing alone is not a constitutional violation. Estelle, 429 U.S. at 106, 97 S.Ct. 285. "Indeed, prison authorities are

accorded considerable latitude in the diagnosis and treatment of prisoners." <u>Durmer</u>, 991 F.2d at 67 (citations omitted).

Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. <u>Clark v. Doe</u>, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000) ("[C]ourts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims since "the exercise by a doctor of his professional judgment is never deliberate indifference." <u>Gindraw v. Dendler</u>, 967 F.Supp. 833, 836 (E.D. Pa. 1997) (citing <u>Brown v. Borough of Chambersburg</u>, 903 F.2d 274, 278 (3d Cir. 1990)) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights"). Under this standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received, particularly where it can be shown that significant medical services were provided to the inmate, but the prisoner is dissatisfied with the outcome of these services. <u>See</u> <u>e.g.,</u> <u>Ham v. Greer</u>, 269 F. App'x 149 (3d Cir. 2008); <u>James v. Dep't of Corrections</u>, 230 F. App'x 195 (3d. Cir. 2007); <u>Gillespie v. Hogan</u>, 182 F. App'x 103 (3d Cir. 2006); <u>Bronson v. White</u>, No. 05-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); <u>Gindraw v. Dendler</u>, 967 F.Supp. 833 (E.D. Pa. 1997).

Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his ... care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." ... [The inmate] alleged no undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care.... Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

James, 230 F. App'x. at 197–198. (citations omitted).

Furthermore, it is well-settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim. See Taylor v. Norris, 36 F. App'x 228, 229 (8th Cir. 2002) (deliberate indifference claim failed when it boiled down to a disagreement over recommended treatment for hernias and decision not to schedule a doctor's appointment); Abdul–Wadood v. Nathan, 91 F.3d 1023, 1024–35 (7th Cir. 1996) (inmate's disagreement

with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); Sherrer v. Stephen, 50 F.3d 496, 497 (8th Cir. 1994) (inmate's "desire for a replacement joint instead of fusion surgery is merely a disagreement with the course of medical treatment and does not state a constitutional claim"); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990) (inmate failed to prove deliberate indifference where his complaints represented nothing more than mere disagreement with course of his medical treatment). Therefore, where a dispute, in essence, entails nothing more than a disagreement between an inmate and caregivers over alternate treatment plans, the inmate's complaint will fail as a constitutional claim. See e.g., Gause v. Diguglielmo, 339 F. App'x 132 (3d Cir. 2009) (dispute over choice of medication does not rise to the level of an Eighth Amendment violation); Innis v. Wilson, 334 F. App'x 454 (3d Cir. 2009) (same); Rozzelle v. Rossi, 307 F. App'x 640 (3d Cir. 2008) (same); Whooten v. Bussanich, 248 F. App'x 324 (3d Cir. 2007) (same); Ascenzi v. Diaz, 247 F. App'x 390 (3d Cir. 2007) ("[T]he exercise ... of ... professional judgment is never deliberate indifference.") Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997) (citations omitted).

The defendants first argue that the plaintiff has failed to assert a claim of deliberate indifference since he received medical care for his infection, but simply disagreed with the scope of treatment. Indeed, although a disagreement with the

scope of treatment does not rise to the level of deliberate indifference where some form of treatment was provided, and it is well settled that, "[c]ourts will not second guess whether a particular course of treatment is adequate or proper," where some form of treatment was provided, Coleman v. Edinger, No. 1:16-CV-0545, 2017 WL 736853, at *7 (M.D. Pa. Feb. 24, 2017) (citing Parham v. Johnson, 126 F.3d 454, 458 n.7 (3d Cir. 1997), courts have also recognized that "[c]ommon sense dictates that wounds must be kept clean to prevent or treat infections, and that regular bandage changes and care would help keep a wound clean, especially in a prison environment." Cruz v. Cunningham, No. 3:18-CV-1321-MAB, 2022 WL 1555371, at *16 (S.D. Ill. May 17, 2022) (citing Banks v. Patton, 2019 WL 189243, at *6 (E.D. Wis. Jan. 14, 2019). Indeed, other circuits have found a claim of deliberate indifference is stated "where the medical staff allegedly refused to examine or change the dressing for a prisoner's wound altogether in spite of several direct requests." Richmond v. Huq, 885 F.3d 928, 939 (6th Cir. 2018). Moreover, the Supreme Court has recognized that the subjective prong of deliberate indifference could be manifested by prison doctors "intentionally interfering with the treatment once prescribed," Estelle v. Gamble, 429 U.S. 97, 105 (1976), and other courts have held that there is sufficient evidence to allege an Eighth Amendment claim "when a plaintiff provides evidence from which a reasonable jury could infer that the

defendant doctor disregarded rather than disagreed with the course of treatment recommended by another doctor." Zaya v. Sood, 836 F.3d 800, 803 (7th Cir. 2016).

Here, the plaintiff alleges that the medical defendants disregarded his discharge instructions from GCMC to apply clean, dry dressings to his wound, including an appointment with Dr. Ahmed at which he alleges the doctor did not change his dressings or clean the wound. Moreover, he alleges that, despite the plaintiff repeatedly notifying the nursing staff of his worsening infection, including showing them the wound several times daily, he was never provided any wound care supplies and was forced to clean his infected toe in the sink of his cell and wrap it with a sock. And, although it does appear Curtis saw Dr. Ahmed and Nurse Iannuzzi during the period when his infection was worsening and was receiving his antibiotic medication, his allegations that these defendants wholly failed to appropriately care for his wound at the very least states a colorable claim for deliberate indifference at this stage.

With regard to the defendants' second argument, that the plaintiff has not alleged the requisite state of mind of the defendants to meet the Eight Amendment standard, to the extent that the medical defendants argue that some degree of mean-spiritedness is required for an Eighth Amendment deliberate indifference claim, we disagree. Although it is true the Eighth Amendment cruel and unusual punishment doctrine generally requires the desire on the part of the defendant to inflict

unnecessary and wanton infliction of pain, "[w]hat is necessary to establish an 'unnecessary and wanton infliction of pain . . .' varies according to the nature of the alleged constitutional violation." <u>Fuentes</u> 206 F.3d at 344–45 (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). In the medical deliberate indifference context, the Third Circuit has found deliberate indifference where a prison official: "1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; 2) delays necessary medical treatment for non-medical reasons; or 3) prevents a prisoner from receiving needed or recommended treatment." <u>Bacon v. Carroll</u>, 232 F. App'x 158, 160 (3d Cir. 2007) (citing <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999)). Indeed, the Third Circuit has noted that "deliberate indifference could exist in a variety of different circumstances, including where "'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care'" or where "[s]hort of absolute denial . . . 'necessary medical treatment [i]s . . . delayed for non-medical reasons,'" or where "'prison authorities prevent an inmate from receiving recommended treatment.'" <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 68 (3d Cir. 1993) (citing <u>Monmouth Cty. Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 346 (3d Cir. 1987)).

Here, the plaintiff has clearly alleged that each of the medical defendants saw his worsening toe infection, were aware of the GCMC discharge instructions and his need for wound care supplies and dressing changes and prevented him from

receiving this recommended treatment. In our view, these allegations describe more than just a disagreement about the treatment for his wound, but state that the medical defendants wholly deprived him of wound care supplies and failed to clean and re-dress his wound at any point during his incarceration, despite the instructions from GCMC to do so. This clears the standard to demonstrate a claim for deliberate indifference in the medical context. Accordingly, we will deny the motion to dismiss the deliberate indifference claims against Nurses Iannuzzi, Oleavia, Mahoney, Wayman, Smith, Peterson, Geisler, and Furman, and Dr. Ahmed.

**D. <u>The Corrections Officer Defendants Will Be Dismissed from this Action.</u>**

The plaintiff also alleges the same denial of medical care and deliberate indifference claims against eighteen individual corrections officers who he alleges also denied him medical care for his infected toe. But his claims against these corrections officers fail for one simple reason: In a case such as this, where the plaintiff's complaint reflects that an inmate received some level of on-going medical care, it is also well-established that non-medical correctional staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 (3d Cir. 1993). The rationale for this rule has been aptly explained by the United States Court of Appeals for the Third Circuit in the following terms:

27

> If a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive *not* to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d. Cir. 2004). Applying this standard, courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims. See e.g., Spruill, 372 F.3d 218; Durmer, 991 F.2d 64.

Here, the plaintiff alleges simply that each of the corrections officer defendants was aware of his worsening condition and did not provide him medical treatment. He alleges that he asked each of the officers to send him for medical treatment and requested wound care and cleaning supplies from the officers on duty, but he was denied wound care supplies and medical treatment. But it is also clear that Curtis was being treated by prison medical staff – he was receiving antibiotics three times daily by nursing staff and had an appointment with Dr. Ahmed on

February 17, 2022. Thus, the corrections officers were justified in believing that Curtis was receiving the care he needed and cannot be held liable for his injuries. Accordingly, the County Defendants' motion to dismiss will be granted with regard to the corrections officer defendants Bloom, Burda, Burrier, Dixon, Houman, Jackson, Kelly, Kopa, Loven, Mills, Moskwa, Posluszny, Tavares, Wesley, Wharton, Jones, Sgt. Dranchak, and Sgt. Trichilo.

Finally, having found the only claims against the corrections officer defendants fail as a matter of law, we address whether the plaintiff will be granted leave to amend his complaint to state a claim against these defendants. We recognize that, generally, courts should grant leave to amend a deficient complaint within a set time, "unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (citing Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000)). Here, given the factual allegations which support the plaintiff's claims against the medical defendants, showing that the corrections officers were reasonable in concluding Curtis was receiving some form of medical care, no form of more artful pleading can cure the deficiencies in the claims against the corrections officer defendants. For this reason, we will dismiss the constitutional claims against the corrections officer defendants with prejudice.

!

**II.** **Conclusion**

In closing, since the plaintiff has failed to sufficiently allege that the corrections officers were deliberately indifferent to his medical needs, and he has not stated any other claims against these defendants, these defendants will be dismissed with prejudice. However, we find the plaintiff has stated a claim against the remaining defendants and will deny their motions to dismiss. An appropriate order follows.

_S/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED:    October 31, 2024